J-S66030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE:  N.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF:  D.W., NATURAL MOTHER | No. 923 WDA 2017 |

Appeal from the Order entered May 26, 2017,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): CP-02-AP-164-2016.

BEFORE:  BENDER, P.J.E., DUBOW and PLATT, JJ.

MEMORANDUM BY DUBOW, J.,                    **FILED NOVEMBER 16, 2017**

D.W. ("Mother") appeals from the order involuntarily terminating her parental rights to N.W. ("Child") pursuant to the Adoption Act, 23 Pa.C.S. §§ 2511(a) and (b).  We affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

Mother and B.F. ("Father") are the parents of Child, who was born in December 2014.  Shortly after his birth, Allegheny County Office of Children, Youth, and Families ("Agency") received a report that Mother had admitted that she had smoked marijuana while pregnant.[1]  The Agency became actively involved in February of 2015, after it was reported that the family was homeless, and that there had been instances of domestic violence

---

[1] Mother was known to the Agency from prior referrals going back to 2009 involving her older children.

between Mother and Father. The Agency was further aware that both Mother and Father had unaddressed mental health, drug, and alcohol issues.

The Agency began Crisis in-home services, and both parents were referred to a drug and alcohol program for evaluation and treatment. The Agency established the following goals for Mother: 1) to participate in domestic violence counseling; 2) to develop coping skills; and 3) to work on household management.

In late March of 2015, the Agency received a report that one of Child's siblings had suffered an injury and that domestic violence continued to persist in the family home. The court granted an emergency custody authorization for Child to the Agency on March 26, 2015. Child was removed from Mother's care and placed initially with his paternal grandmother, and then in the care of his paternal aunt ("Foster Mother").

On June 3, 2015, after a hearing, the court adjudicated Child dependent. Following this adjudication, the Agency established the following goals for Mother: 1) to participate in psychological evaluations and follow any recommendations; 2) to attend domestic counseling; 3) to obtain appropriate housing; and 4) to visit the children. The court held four permanency review hearings between September 2015 and June 2016, with the court finding that Mother only minimally or moderately complied with these goals.

The Agency filed a Petition to Terminate Mother's parental rights on August 30, 2016.[2]  The trial court held an evidentiary hearing on May 26, 2017.  The Agency presented testimony from the caseworker who worked with Mother and her family.  It also presented the testimony of Dr. Terry O'Hara, a licensed psychologist who had evaluated and observed interactions between Child and both Mother and Foster Mother.  The trial court summarized Dr. O'Hara testimony as follows:

> Dr. O'Hara conducted an interactional evaluation of Mother, [Child], and one of his siblings on October 3rd, 2016 [sic].  Mother exhibited several positive parenting skills during this evaluation and played well with the children.  However, she was unable to recognize or appreciate the extent of [Child's] developmental delays.  Of particular concern was a comment made by Mother about the [approximately two-year-old Child's] inability to walk.  Mother stated that [Child] was not walking yet because he was "just lazy."
>
> ***
>
> Dr. O'Hara had continued concerns about Mother's stability as she has been inconsistent with services and visitation.  Also of great concern was Mother's longstanding and ongoing pattern of criminal activity.  Mother acknowledged to Dr. O'Hara that she was not in a position to care for [Child].  She reported that she could not care for her child(ren) "right now . . . I'll find me a job and get me a house, and then maybe."

---

[2] The Agency also filed a Petition to Terminate Father's Parental Rights.  He has not filed an appeal from the trial court's subsequent Order granting the Petition.

Dr. O'Hara conducted an interactional evaluation with [Child] and his [Foster Mother] on May 1st, 2017 [sic]. [He] opined that the Foster Mother displayed excellent parenting skills and was attuned to [Child's] developmental and medical needs. It was his opinion that [Child] had developed a strong relationship with Foster Mother.

Trial Court Opinion, 7/26/17, at 5-6 (footnotes omitted).

Mother did not testify and presented no evidence. By order entered May 26, 2017, the trial court found that the Agency had met its statutory burden pursuant to 23 Pa.C.S. §§ 2511(a) (2), (5), (8) and (b).

Mother timely appealed. Both Mother and the trial court have complied with Pa.R.A.P. 1925.

**ISSUE ON APPEAL**

Mother raises the following issue on appeal:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of [Mother's] parental rights would serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. §2511(b)?

Mother's Brief at 6.

**LEGAL ANALYSIS**

"[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). This standard of review requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *Id.* "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its

- 4 -

discretion." ***Id.*** We may reverse a decision based on an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** We may not reverse, however, "merely because the record would support a different result." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." ***Id.*** Moreover, the trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation omitted).

**Termination Pursuant to Section 2511(a)**

Mother concedes that the Agency presented sufficient evidence to terminate her parental rights pursuant to Section 2511(a). ***See*** Mother's Brief at 13. Thus, we need not conduct an analysis of the court's Section 2511(a) findings.

**Termination Pursuant to Section 2511(b)**

We agree with the trial court's determination that the Agency met its burden under 23 Pa.C.S. § 2511(b), and that terminating Mother's parental rights is in the best interest of the Child.

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re: Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court found that "intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.*

In cases where there is no evidence of a bond between a parent and a child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Thus, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763. Moreover:

> We have emphasized that while a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when

determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the trial court must examine the status of the bond to determine whether its termination would destroy an existing, necessary, and beneficial relationship.

*In re A.D.*, 93 A.3d 888, 897-98 (Pa. Super. 2014) (citations and quotation marks omitted).

Finally, "[i]n addition to a bond examination, the court may equally emphasize the **safety** needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs." *Id.* at 898 (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010)).

In the instant case, the trial court found, based primarily on the testimony presented and a review of Dr. O'Hara's evaluations, that although Mother and Child share a bond, it is secondary to Child's primary bond with his Foster Mother. Given this evidence, the trial court concluded that benefits of Child's adoption by Foster Mother outweighed any detriment that may be experienced by Child upon severing Mother's parental rights. It explained:

> Mother has never availed herself of any service or program that would have assisted her in being able to meet the needs of [Child]. Throughout the case, Mother has never been able to attain any level of stability. As a result, she has been unable to remedy the conditions which brought [Child] into care. At the core of this instability has been Mother's role as a victim and an aggressor in incidents of domestic violence. Mother demonstrated a pattern of filing Protection From Abuse Petitions and then not following through nor appearing at final hearings. Mother did

- 8 -

complete domestic violence treatment in August of 2015. However, she continued to pursue a relationship with Father despite numerous violent encounters between the two.

The Court had grave concerns about the effects of domestic violence on [Child]. Based upon Mother's own admissions, the children were subjected to domestic violence daily. Based upon the number of police calls to the home, it is apparent that the parents engaged in violent incidents while Mother was pregnant with [Child]. This evidence was particularly concerning to the Court based upon Dr. O'Hara's testimony regarding the effects of domestic violence on children. Most notably, he referenced research which supported a conclusion that children exposed to domestic violence were much more likely to suffer long term physical, mental and emotional effects. He reported that this case was one of the worst cases of domestic violence that he has seen in the last 20 years. He did not believe that Mother would be able to decrease her vulnerability to engaging in these type[s] of relationships. The Court shares in this conclusion as Mother has never separated from Father for more than a few weeks. Mother could not even make it a week without allowing Father to attend her unsupervised visits, despite knowing the consequences of doing so.

When considering what best met the needs and welfare of [Child], this Court also considered Mother's lack of cooperation with services. Mother has failed to attend mental health treatment consistently. She has not attended drug and alcohol treatment nor has she attended random drug screens consistently. Mother has not maintained stable housing throughout the case. She had two brief periods in which she was consistent with visitation. Mother has not made herself available to sign paperwork for [Child's] medical and educational services. Mother's lack of cooperation has caused [Child] to experience delay in services. All of these factors have contributed to Mother's inability to meet [Child's] needs.

With respect to the detriment that may be caused by termination of Mother's rights, Dr. O'Hara opined that he did not have evidence that [Child] had a necessary and beneficial relationship with [Mother]. Dr. O'Hara opined

that if [Child] were placed with Mother, he would be at risk for homelessness and exposure to domestic violence. [Child] has been in care for a substantial amount of time. [Child's] current foster home offers him security, safety and stability. He has a positive bond with [Foster Mother]. [Child] deserves permanency and to grow up in a home where he is not exposed to domestic violence daily.

This Court finds that [the Agency] has presented clear and convincing evidence to support the involuntary termination of the parental rights of Mother as to 23 Pa.C.S.A. § 2511(b) and that termination best suits the needs and welfare of [Child]. It is the ultimate opinion of this Court that the benefits of adoption outweighed any potential detriment to [Child].

Trial Court Opinion, 7/26/17, at 7-9. We agree. *See T.S.M.*, 71 A.3d at 253 (explaining "courts must determine whether the trauma caused by breaking the bond is outweighed by the benefit of moving the child toward a permanent home").

Mother argues that the trial court erred in concluding that the testimony and exhibits presented by the Agency presented clear and convincing evidence that the termination of her parental rights would best serve the needs and welfare of Child. According to Mother, error occurred because the court "applied a fault-based analysis in regard to [her] alleged lack of progress and balanced that against the positives it found in regard to [Child's] foster parent." Mother's Brief at 10. Citing to the trial court's comments enumerated above, Mother asserts that the trial court improperly focused on her faults rather than Child's welfare, and "clearly balanced what it considered to be the benefits of [Child] remaining with his foster parent against its perceived fault on [her] part[.]" *Id.* at 16.

When performing a needs and welfare analysis, trial courts are permitted to consider the totality of the circumstances. *In re Coast*, 561 A.2d 762, 771 (Pa. Super. 1989) (*en banc*). Moreover, the bond between parent and child must not be viewed solely from the child's viewpoint; rather, a bilateral relationship must exist which emanates from the parent's willingness to parent appropriately. *In re K.K.R.-S.*, 958 A.2d 529, 534-35 (Pa. Super. 2008). In this manner, Mother's inability to parent remains relevant to consideration of Child's needs under Section 2511(b). Indeed, by not contesting the trial court's findings regarding Section 2511(a), Mother concedes her inability to parent, and thus her inability to provide Child with permanency.

Our careful review of the record demonstrates that the trial court properly considered the strength of the bond with Mother and the safety risk should Child be returned to her care. As noted above, the uncontradicted testimony established that Child did not have a necessary and beneficial bond with Mother, Child was bonded with Foster Mother, and that his need for permanence, security, and safety outweighed any detriment to severing Child's bond and/or attachment to Mother.

**CONCLUSION**

In sum, our review of the record supports the trial court's determination that that the Agency met its burden of proving by clear and convincing evidence that Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(b). Accordingly, we affirm.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/16/2017